The last argued case this morning is the United Therapeutics Corporation v. Liquidia Technologies, 2022-2017 and 23-10-21. Mr. Suk Duong, is it? Yes, Your Honor, Suk Duong. Thank you. Good morning, Your Honors. Sonia Suk Duong on behalf of Appellant Liquidia. We did brief a claim construction issue concerning the 793 patent with respect to the phrase treating pulmonary hypertension and believe if this Court actually construes that phrase to include safety and efficacy in treating pulmonary hypertension, we would prevail on the issues of lack of enablement and lack of written description. Well, the word safety isn't in the claim. You're right, and the word efficacy is also not in the claim either. But yet the Court, in the opinion, determined that the claim only required efficacy, not safety. I did want to turn to the 793 enablement issue unless you'd like to talk about the claim construction issue. Please proceed. Well, with respect to enablement, under the District Court's current construction that excluded safety, the claims of the 793 patent are still non-enabled. The basis for the District Court's determination on enablement rests on a study called the FIRST study, and that was the administration of a process cyclin called eprosinol to patients with isolated group 2 pulmonary hypertension. And that was, by all accounts, a failed study terminated prematurely because it caused death. The drug caused death. Well, enablement has to be in the specification, and this patent does address enablement quite a bit. Look at Column 7. Eprosinol can be administered by inhalation, and there are almost two columns of enablement. Those descriptions, Your Honor, discuss how you administer the drug, and we don't dispute that the patent itself clearly tells you that you inhale the troposinol. Well, the claim is to a method of treating pulmonary hypertension, and the patent tells you how to do it. The claim is directed to treating pulmonary hypertension, but the scope of pulmonary hypertension includes all five groups, so that's what the District Court found. That includes isolated group 2, and you have to enable the full scope of the claim in order for the claim to be enabled. Isolated group 2 comprises, and however you want to look at it, comprises 50% of the population. Isn't that an FDA issue? No, it's not. It's a patent issue. When you look at if a patentee is going to claim pulmonary hypertension by administering a drug in a certain way, they have to enable that full scope of treatment. Here, our position is, and I believe the experts are in line with this issue, within pulmonary hypertension there are five groups. One of those groups, isolated group 2, is a post-capillary disease. It's a left heart disease. That comprises 50% of all patients with pulmonary hypertension. Did the court below say 50%? Did the court below agree with that? The court, I'm not sure, found a fact-finding with respect to the total population of 50%, but it was unrefuted testimony from Liquidius expert Dr. Winkler, and that is the position that was presented to the court. But you're correct. There is no express finding. If you step away from the 50%… I don't even know if it matters, to be honest with you. I looked at the evidence underlying that. It was like, oh, here's a study with 5,000 people and 50% of them, this is how they presented, and then there was something else that was a study just for group 2, and 52% of those people had isolated group 2. So it just, I don't know, I wasn't sure about that evidence. But even if it were 20%, would you still be standing here making the same argument? Yes, we would, because when you look at the scope of the claim, whether you look at it, 50% of the population, 20% of the population, even if you look at it as one out of five, five groups, group 2 is one of those groups. Under the trustees, the University of Boston case, one out of six was sufficient to establish non-enablement. But counsel, every claim to a method of treatment of an ailment has refinements. In 1880 or whenever it was, if there had been a claim, probably was, to a method of treating pain with aspirin, there are lots of patients who shouldn't take aspirin. And are we going to bifurcate or multifurcate every claim to a method of treatment? And to all of the people, does a patent specification have to resemble a Packard circular that the FDA approves? No. The patent specification does not need to meet FDA standards. Why not? No. What here, the study that the district court relied on, and it's really the sole basis for the finding of enablement, is a failed study. It did not treat the pulmonary hypertension of this patient population. The issue with respect to parsing out, we would argue that when the claim expressly requires a certain number of groups to be treated, and it is known in the specification and in the prior art, the first study, that it does not treat that population, that study cannot be used to enablement. This isn't a claim to treatment of one, two, three, four, and five types.  It is, Your Honor. Expressly. The district court expressly found that. When you look at Appendix 58, Finding of Fact Number 3, treating pulmonary hypertension includes all five groups. That is an express finding by the court. So it is treating all five groups. Is that a finding of fact or is that a claim interpretation? That is both a finding of fact and a claim interpretation. How is it a finding of fact? Well, first the specification defines in Column 1, pulmonary hypertension is Groups 1 through 5. The experts in this case agreed when they talked about whether you would treat 1 through 5 what pulmonary hypertension encompasses. There's no dispute that the scope of the claim and claim construction, when you look at it, could be a legal issue, but it has to be based on facts that a person with a lower skill in the art would understand. There's no dispute on that. What Appellee has argued in their brief is that you could actually construe the claim differently. You construe the claim post-capillary, which would be isolated Group 2, or pre-capillary, which is the scope that they say is enabled. In that instance, you would be construing the claim to preserve its validity because there's nothing in the specification of the patent or testimony from the experts in this case to cause that demarcation with respect to pulmonary hypertension. What about the fact that all of the examples are pre-capillary? All of the examples are pre-capillary. There's no dispute on that. But what's important is that the examples use the term pre-capillary. The specification also uses the term pulmonary hypertension, and the claim uses the term pulmonary hypertension. What about the fact that there's evidence on both sides that a person of ordinary skill in the art, seeing the active drug in this claim, would have understood that it wouldn't be ideal to apply that drug to a post-capillary patient? And that goes to the factual error in relying on the first study because the experts would agree on that. So when you look at that evidence, what a post is entitled to do is to look at the patent. And the patent claims, and this is a new... is the novel aspect of this claim. It had never been inhaled. It had never been claimed as inhaled in this manner before. So when a post, looking at the patent, says, Oh, prostacyclines... You're talking about a person of ordinary skill in the art, speaking English, right? Correct. So when looking at that patent claim, the doctors, in this case, have a right to say, Well, if I inhale trypostanol, maybe that route of administration, as opposed to the prior routes of administration, which were IV or subcutaneous or oral tablets, that might impact Group 2 differently than other groups. So when you look at the claim, that's what they would believe. The fact that later on, through the first study, establishes that it will not work, it does not treat, that supports the enablement. Their claim construction argument saying you should construe the claim to cover pre-capillary, again, reinforces the lack of enablement. And the point you raised, Judge Stoll, that the experts agree that trypostanol or prostacycline wouldn't be used in an isolated Group 2 only further confirms that the district court circumvented those facts, undisputed facts, relied on a reference that was undisputedly a failure, and nonetheless said that the full scope of the claims were enabled. One of the things the district court relied on was the claim language, therapeutically effective single event dose, right? Correct. I mean, I think that means that we're talking about administering at one time. Is that right? Do I understand that correctly? That was an issue with respect to infringement, which is not on appeal. How the district court construed therapeutically effective amount was a hemodynamic change. And what the district court said is that because the first study shows a hemodynamic change in those Group 2 patients, that establishes enablement. But the facts are, what the experts testified to, Dr. Waxman, who was UT's expert, and Dr. Winkler, which was Liquidia's expert, they all testified that for an isolated Group 2 patient, their hemodynamics, their PVR, are normal, and you would not administer a drug like troposinol, which is going to vasodilate the pre-capillary to patients who have normal hemodynamics. It has no treatment effect. So to come back to Judge Lurie's hypothetical about the aspirin, and it would seem to be correct that the mere fact that there are some patients who aren't going to benefit from a treatment doesn't result in a lack of enablement or invalidation of the patent. How do you draw the line between that example and the situation that we have here? Is it because the patent identifies a separate group that doesn't benefit from it? What's the difference? The difference is, and the way the cases read, is that there have to be a significant number of inoperable embodiments to trigger over to the non-enablement side. Here, we take the position that there is a significant number. You can have inoperable embodiments and still be enabled. But if the number of inoperable embodiments becomes significant, then the enablement becomes a question. Here, how we look at it, and what the district court found, is that group 2 is one of five groups. That is a significant number of groups. If you look at pre... Is it only one of six, anyway, or something like that? It's one of five. There are five groups. The reason why, let me explain. The reason why is because there's post-capillary patients who have combined with pre-capillary and post-capillary. So that's kind of six groups, right? No, because those combined fall into group 2. The understanding of the clinicians, the persons of skill and the art, are that there are five groups, not six. And the pre-post... That's why I'm asking this, because I thought, I could be wrong, but I thought there was evidence in this case that the claimed invention could be effective to treat somebody who's combined. There is... There was testimony that it might work for someone who's combined because the combined patient in group 2 has a pre-capillary component. It would work on the... I don't think the district court had a fact-finding on that issue. The district court focused in on the post-capillary versus the pre-capillary aspect. Coming back to your question, and I apologize. The line is a significant amount of inoperative embodiments that goes to Judge Lori's question about the aspirin. Here, pre and post, if you look at it in that context, it's 1 out of 2. That's a significant number. We believe 1 out of 5 is a significant number. We believe when you look at the total patient population of pulmonary hypertension, 50%. What's the 50% number based on? So there is a study that Laquitia's expert, Dr. Hill, testified to that when they looked at 5-something thousand pulmonary hypertension patients, half of those patients fell into this isolated group 2. It's in the record, and I can provide the record site when I come back up. Counsel, you wanted to save 7 minutes. If you have a bubble time, you're down to about a minute and three-quarters. Do you want to save the rest? Yes, unless you have any further questions. We'll give you two minutes of the bubble. Thank you, Your Honor. Mr. Jay. Mr. Jay, has this patent been revalidated by the PTAP? There is a final written decision holding these claims unpatentable. That's correct, Your Honor. Of course, that's on appeal to this court, and we'll get here in due course. But for the reasons that we've set out in our brief, it has not been invalidated because it has not been that proceeding is not yet final. So turning to the enablement point, do you agree that if there were a significant number of patients covered by these claims who wouldn't benefit from this therapy, that it wouldn't be enabled? I don't agree with that. I mean, I don't think that those are the facts here, but I think that the question whether to apply the invention to a particular group of patients, whether because there's a better therapy or because it's contraindicated for some reason, that I think does not speak to whether it's enabled. This invention is enabled for the reasons that just... So the fact that it would be inoperative for a significant number of the class covered by the patent is irrelevant to enablement? Well, respectfully, Your Honor, I took your question to ask whether it would be beneficial, which is not, I think, quite the same thing as your second question. Let's just assume, hypothetically, we can come to the second part of this later, but let's assume that it is not beneficial, it doesn't result in the treatment of a significant number of patients covered by the claims. Does that mean a lack of enablement because it's significantly inoperative? Well, because these claims claim a therapeutically effective amount of troprostanil to treat pulmonary hypertension, the patent does have to enable the use of a therapeutically effective amount to treat pulmonary hypertension. But the construction of the claims, as I think the questioning... Your Honor, you're sort of wandering all over the place. I don't think you're answering my question. If you have a claim that covers five classes, and let's assume that this one does, and that one class, group two here, let's assume is 50% of the patient population, and if it simply doesn't work, hypothetically, for that group two, doesn't that show a lack of enablement? So you'll allow me to come back to why we disagree with the premise, of course. But to answer your question, it could. It would depend on what the background knowledge of the skilled artisan would be. So in other words, if it's compatible with the knowledge of the skilled artisan to treat or withhold treatment based on accepted practice in the art, for example, it could still be enabled. So you could write a claim that's substantially inoperative, and if people would know that it was inoperative, it's still valid? Well, I think this points to exactly the line-drawing problem that you asked my friend about. But answer my question. I mean, that seems kind of odd. You're saying that you could write a claim that's substantially inoperative as to a majority of the patient population, but the fact that people would know that it was inoperative is sufficient to solve the enablement problem? Is that what you're saying? So there are a lot of things built into your question that are not the facts of this case. But let me answer directly. So I think that that could be an enablement problem, but it would turn on the knowledge of the skilled artisan. What do you mean, would turn on? What knowledge? It depends on how the claim is worded. Right here we have... Because we are talking about a claim that actually claims therapeutic efficacy. And so if you were talking about differently worded claims that didn't claim that, then the enablement inquiry would look different. It might well... Okay, but let's assume in my hypothetical that the claim claims therapeutic efficacy. Right, so then it does have to tell the skilled artisan how to practice the claim in a way that is therapeutically effective. So in your hypothetical, it's not therapeutically effective to a large number of people. Yes, that could be an enablement problem. But several reasons why those are not the facts of this case. One is the finding that for all patients... Under the construction that the other side has not appealed and that my friend got to at the latter part of his argument, therapeutic efficacy in this case means improving the patient's hemodynamics. That's all. Whereas the study that my friend referred to as a failed study, that's a chronic intravenous administration over a very long term of this medication. So it's not... If you distinguish this enablement case where we're talking about enabling treatment of a disease, distinguish that from the case of the Supreme Court, for example, where we're talking about a genus of compounds where we found it not enabled because there just wasn't enough indication of enablement with respect to the full scope of the claim. Isn't that... Isn't it different trying to parcel out... ...dissect a treatment, a disease? Isn't that quite different from the case of a bunch of compounds in a genus claim? I do agree with that, Your Honor, because in the treatment claim, to say that the enablement inquiry would then pick up FDA-type questions about which patients this shouldn't be used with, that's exactly the line-drawing problem that both you and Judge Dike were asking my friend about. And that's not open Pandora's box with respect to method of treatment claims because there's a wide variety of ramifications to how you treat various patients. Right. What's necessary to enable a claim is to teach the skilled artisan how to make or use the claimed invention. Here, the claimed invention is the method of treatment, and the patent teaches what condition it treats, what drug to use, what dose to use, how to administer it... Even if it doesn't work on some patients. That's exactly right. Whether to administer the drug compared to other therapies, for example, is not part of the enablement inquiry. And then the other reason, just to get back to Judge Dike's line of inquiry, the other reason why this is not like the hypothetical that you posited is that there are findings in this case that, as construed, this will improve the hemodynamics of a patient to whom you administer the claimed dose. Okay, but there are no findings as to what percent of the patient population the claim is inoperative as to. Well, I disagree, Your Honor, because the finding is that as to patients in all the groups, if you administer the claimed dose, it will be effective to improve the patient's hemodynamics. That's all that's necessary. Even if it kills somebody. So there's no evidence at all, Your Honor, that a single administration, which is what is claimed here, would do that. The safety concern that's raised in the first study, that's a long-term study, chronic administration intravenously of this medication. There is no testimony that administering a single dose would pose the kind of safety issues that would be non-enabling. What there is testimony to is that the other side's expert says, you know, he would act with caution. And I think that's as far as they got on the administration of a single dose. He said at page, I think, 13200, that his testimony was based on the other side's claim construction of therapeutically effective, which the district court did not accept and which has not been appealed to this court. That's quite relevant for the court's consideration of the enablement point. I do want to answer the 50% point Judge Stoll. I think it's not relevant because of the answer that I just gave. In other words, the finding is that if you give this dose to someone in isolated group 2, it will still improve the patient's hemodynamics. But there is no finding on the 50% figure, and our expert testified that in his experience, admittedly this is not something that the district court resolved, but at 13183, you'll see that in Dr. Waxman's experience treating a couple thousand patients, he thought the proportion was lower. Again, the district court did not need to resolve that question precisely because of its finding that it would be therapeutically effective even as to isolated group 2 patients. We think that's the simplest basis on which to affirm the district court that that finding is not clearly erroneous, especially because it's tied to the claim construction. If I could, I'd like to turn to the cross appeal, unless the court has further questions about the 793 patent. And on the cross appeal... Can I just ask you real quickly about the written description? The written description asks us whether a person of ordinary skill in the art would think that the inventor was in possession of the invention. So I just want your take on, you know, here in this case, in order to get a certain claim construction, I think your expert said something like, I would never apply that treatment, or I wouldn't apply this kind of treatment. I would know from looking at the claim that I would not apply this to a group 2 patient. So how does that play into whether a person of ordinary skill in the art reading the specification and reading the claim would think that the inventor was in possession of the invention? So just basics first, right? The means of administration and the dose and all of that, that's set out, and the studies, which all involve the administration of a single dose, that's all set out. And so the testimony that you're referring to our expert said that he would administer diuretics instead, for example. So I think that it is not necessary for written description to establish that it would be a good idea or certainly not the best therapy to administer the claimed method. What's claimed is the therapeutically effective dose, and there are studies demonstrating the possession of that therapeutically effective dose as administered to pulmonary hypertension patients. It's not necessary for description that you have a study as to every possible subcategory of patients to which you might administer the claimed method. There are actual studies involving administering the claimed dose and the claimed means of administration. Wouldn't you have to have written description of support for the idea that it's effective with respect to that part of the patient population? In this respect, it looks somewhat similar to NOVO, right? No, to NOVO? I don't think so, Your Honor, because NOVO is not about a part of the patient population at all. And, of course, NOVO in this case are both clear error cases. NOVO is affirming a finding of no written description. In this case, you have a finding of adequate written description, but even setting that aside, NOVO is about whether for any administration the claimed dose would be effective to increase gastric pH, and there was no basis in the specification or in the knowledge of the skilled artisan to think that it would work for that. Here we have actual studies administering this dose, this therapy, to pulmonary hypertension patients. I think that's a major difference. So if I can turn just briefly to the cross-appeal. Let me just start with the invalidity argument on the 066 patent, the anticipation of the product by process claims. So we think that where the district court went wrong in this case is that it didn't look at the structural features that are imparted by using the different process. In other words, this is not the same old medication. This is a new substance, and that is a new pharmaceutical composition. That's because if you look at the claim language, you will see that the composition has to include a lower level of impurities. Now, the impurities could be reduced to zero. So one could avoid anticipation by claiming the compound with impurities? I mean, that sounds absurd. The compound is old, described in Moriarty, and there are even some impurities in Moriarty. I think it's just, what, 98.7% pure. And so putting impurities into the claim distinguishes it? So these are specific impurities that have particular therapeutic significance, and you will find that in the testimony of Dr. Tost in the record, especially at page 13069. And it's the reduction of that impurity that's the improvement in the prior art. So triprostanil is in the prior art, but this formulation with the... This isn't a method of eliminating impurities in triprostanil by hydrolyzing, precipitating, or recrystallizing. This is a pharmaceutical composition. It is a pharmaceutical composition, but because the claim language says that the composition includes the lower level of impurities, that is what separates this from the prior art. That fundamentally goes to what is claimed rather than the application of the doctrine. Let's see. I'm about to run into my rebuttal time. I haven't mentioned synovia, so unless the court has any questions on that issue... We'll save your rebuttal time if there is something to rebut. I understand. You're right. Thank you very much. Mr. Sukhdwan. Thank you, Juan. With respect to the 50%, it's Appendix Site 369930699. And particularly in that study, which Dr. Hill and I misspoke. Our expert was Dr. Winkler on this issue. It's Dr. Hill. 52% had isolated group 2. His testimony corresponding to that goes to Appendix Site 13168. With respect to the parsing out, I'm coming back to the aspirin question again. If someone had come along later on and found that aspirin worked for a specific type of pain, they found that that administration worked, it wasn't disclosed in the prior art, and they can establish that it was unexpected that it worked for a particular type of pain, you'd get a patent claim on that. That is what UT and the 793 patent is trying to preclude now. If someone in the future were to determine that if you administer troposylenol in some other manner to treat this population, then they would be able to argue that it would be unexpected, non-obvious, and try to get a patent claim on that. So it's not a parsing out in terms of, well, I disclose a compound and be able to use it for every disease or all of pH that's enabled. Here, the significant number of patients that fall into this category, however you parse it out, is enough to tilt it over to the non-enablement side of things. Okay, but their argument in that respect is that it does help those patients, it is a therapy for those patients, because it causes vascular violation, right? Actually, the evidence is that it does not help those patients. Dr. Waxman, UT's expert, and Dr. Hill both said that a vasodilator like troposylenol would have no treatment, no impact, on a group 2 patient because the cause of the disease is on the left side of the heart, post-capillary. Vasodilators work on the pre-capillary side. And in fact, Dr. Hill testified that the administration of a vasodilator like troposylenol would likely cause the problems you see in that first study because now you're opening up the pre-capillary, more blood is rushing through to the left side of the heart, that's going to cause the pulmonary edema. And in fact, the study, the first study, was terminated prematurely because of death. This is an instance where the evidence establishing enablement, the district court's factual finding to establish enablement of the claims rests solely on a study that was terminated prematurely because the drug, not some other cause, but because of the drug, increased the mortality rate in this particular patient population. Counsel, as you can see, your time has expired. I appreciate it. Thank you, Your Honor. Mr. K lost his gamble, so we'll take the case under submission. And that concludes today's argument.